UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA       )
                               )
        VS.                    )  1:23-CR-173 AND
                               )  1:24-CR-179  CMH
                               )
                               )  ALEXANDRIA, VIRGINIA
                               )   MARCH 14, 2025
                               )
RICK TARIQ RAHIM               )
_____)

_____

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**
_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

# A P P E A R A N C E S

FOR THE PLAINTIFF:
        UNITED STATES ATTORNEY'S OFFICE
        By:  MS. KIMBERLY M. SHARTAR
        Assistant U.S. Attorney
        2100 Jamieson Avenue
        Alexandria, Virginia  22314
        703.299.3700
        kimberly.m.shartar@usdoj.gov

        U.S. DEPARTMENT OF JUSTICE
        TAX DIVISION
        By:  MR. WILLIAM M. MONTAGUE
1       MS. ASHLEY J. STEIN
        150 M Street, N.E.
        4 Constitution Square
        Washington, D.C.  20002
        202.616.2386
        william.m.montague@usdoj.gov
        ashley.j.stein@usdoj.gov


FOR THE DEFENDANT:
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
        By:  MS. ANN MASON RIGBY
        Assistant Federal Public Defender
        1650 King Street
        Suite 500
        Alexandria, Virginia  22314
        703.600.0800
        ann_rigby@fd.org

        WINSTON & STRAWN LLP
        By:  MR. RICHARD WEBER
        MS. ANNETTE FAVETTA
        200 Park Avenue
        New York, N.Y.  10166
        212.294.6700
        rweber@winston.com


OFFICIAL U.S. COURT REPORTER:
        MS. JULIE A. GOODWIN, RPR
        United States District Court
        401 Courthouse Square
        Alexandria, Virginia  22314
        571.229.7074

1 (MARCH 14, 2025, 10:03 A.M., OPEN COURT.)

2 THE COURTROOM DEPUTY:  Criminal Case 23-173 and

3 24-179, *United States of America versus Rick Tariq Rahim.*

4 Would counsel please note their appearances for the

5 record.

6 MS. SHARTAR:  Good morning, Your Honor.  Kim Shartar,

7 and I'm joined by Will Montague and Ashley Stein from the tax

8 division.

9 THE COURT:  All right.  Good morning.

10 MS. RIGBY:  Good morning, Your Honor.  Ann Mason

11 Rigby, Rich Weber, and Annette Favetta on behalf of Mr. Rahim,

12 who is present.

13 THE COURT:  All right.  Good morning.

14 ALL COUNSEL:  Good morning, Your Honor.

15 THE COURT:  All right.  Counsel, have you and your

16 client had an opportunity to review this presentence report?

17 MS. RIGBY:  Yes, Your Honor.

18 THE COURT:  Any corrections you want to make to it?

19 MS. RIGBY:  No corrections, Your Honor.  We have

20 lodged objections, as the Court knows, but we don't have any to

21 add this morning.

22 THE COURT:  All right.  Well, go ahead with your

23 objections.

24 MS. RIGBY:  Your Honor, let me just -- I think the

25 government is going to want to note this as well.  There are a

1  number of issues here to cover this morning, so I just want to

2  forecast for the -- for the Court that we are going to be

3  splitting the objections argument and then Mr. Weber is going

4  to do the argument on the 3553 factors, so just to give you

5  that heads-up.  So, I -- I will begin, Your Honor, with the

6  objection regarding --

7           THE COURT:  Well, I've read -- I've read through all

8  of this, so give me a summation.  I don't need the details.

9           MS. RIGBY:  Thank you, Your Honor.

10          MS. SHARTAR:  Your Honor, before we go too far,

11 though, we would like to put some findings on the record as to

12 his competency given the medications he's on.  Happy to do that

13 at any point in the hearing that you would like, but we do have

14 some, like, general ideas or items that we would like to go

15 through so that it's clear for the public record, if this was

16 ever to be appealed, that he is indeed competent despite being

17 on certain medications.

18          THE COURT:  Well, go ahead.  You're there now.  Go

19 ahead.

20          MS. SHARTAR:  Okay.

21          MR. MONTAGUE:  Your Honor, as the government

22 understands it, the defend -- defense is not contesting that

23 Mr. Rahim is in fact incompetent, but because he is on drugs it

24 could alter his mental state.  We just want to make sure that

25 he is competent, so we would ask, one, that he be asked whether

1 or not he is currently taking any medication.  If so, if he is

2 of sound mind, able to understand the proceedings and able to

3 communicate with his attorneys about the proceedings.

4         THE COURT:  All right.

5         MS. RIGBY:  Your Honor, I can represent that having

6 spoken with Mr. Rahim this morning I have no concern about any

7 of those factors.

8         THE COURT:  All right.

9         MS. RIGBY:  So we're not concerned that he's not

10 competent.

11         THE COURT:  Very well.  Go ahead with your motion.

12         MS. RIGBY:  Thank you, Your Honor.

13             And one more housekeeping item.  I do want to renew

14 our objection to the denial of the motion to continue.  We --

15 we had argued, obviously, that it would be important for the

16 Court to hear from an expert in BOP medicine, as the Court

17 consider both the sentence and the report date in light of

18 Mr. Rahim's progress and recovery.

19         THE COURT:  Well, you have your objection to that.

20 I've already -- I've already denied your continuance.

21         MS. RIGBY:  Understood, Your Honor.  Just for the

22 record, we wanted to make it, but -- and simply to say that we

23 do have the Court's ruling and we understand that.  We did push

24 our expert to provide us with a -- the bare bones regarding

25 Mr. Rahim's report date.  I was not even sure he would be able

1  to do that.  He did provide that last night.  I sent it to

2  counsel for the government, and I submitted it to chambers.  I

3  don't know if you've received it yet.

4         I can hand that up now or when we get to the issue

5  of report date, as the Court directs, but it is a brief letter

6  that I would like the Court to consider when we get there.

7         THE COURT:  All right.  Go ahead.

8         MS. RIGBY:  Thank you, Your Honor.

9         Turning to the objection regarding guideline 3C1.3,

10  Your Honor, this is the guideline that states that if 18 U.S.C.

11  3147 applies, then the Court should enhance -- excuse me,

12  adjust upward the guideline by three levels.

13         Our position is that this guideline only applies if

14  3147 applies, and 3147 only applies if a person has been

15  convicted -- excuse me, if the -- the statute under which the

16  defendant is being convicted - in this case the government's

17  argument is the wire fraud statute - if he was convicted for

18  conduct committed while he was on pretrial release.

19         And the government's position is that because the

20  statement of facts includes some admissions of fraudulent

21  conduct in the period during which Mr. Rahim was on

22  supervised -- excuse me, on pretrial release, then this

23  guideline applies.  But our position is that the guideline only

24  applies if 3147 applies.  And in this case, Mr. Rahim was not

25  convicted of the conduct that took place while he was on

1   pretrial release.

2           The information in the wire fraud case covers only

3   the TradeAutomation scheme, and both the information and the

4   statement of facts make clear that that conduct spanned

5   September 2021 to March of 2023.  Mr. Rahim was not on pretrial

6   release in any matter, in any matter at all until June of 2023.

7   So, for those -- he was not convicted of conduct post-dating

8   March 2023.  And because the statute does not apply, then the

9   guideline does not apply.

10          And it is -- it does not matter that there are

11  allegations regarding post-March 2023 conduct in the statement

12  of facts.  Certainly the Court can consider that for the loss

13  calculation.  The Court can consider that under 3553, but the

14  guideline that we're talking about specifically requires there

15  to have been a conviction of conduct while the person was on

16  pretrial release.  And there is not that here, and so the

17  three-level adjustment should not apply.

18          THE COURT:  All right.

19          MS. RIGBY:  And I just would add to that, Your Honor,

20  that the guideline is very precise.  It does not say that if

21  some of the relevant conduct was committed while on pretrial

22  release.  It doesn't say if the defendant committed an offense

23  while on pretrial release.  It says, If the statutory

24  enhancement under 3147 applies, then the Court is to enhance by

25  three levels.

1          And this statute does not apply here, and it could

2  not apply here.  The statute absolutely could not apply here

3  because Mr. Rahim's conviction is for the TradeAutomation

4  conduct which ended in March of 2023, so this guideline is

5  totally inapplicable.

6          It's clearly designed for a situation in which the

7  government is actually seeking to apply 3147 and the Court has

8  found that 3147 applies.  They're not seeking that.  They could

9  not seek that here.  The guidelines do not apply.

10          THE COURT:  All right.

11          What else?  Let me hear all of your objections and

12  then I'll listen to --

13          MS. RIGBY:  Thank you, Your Honor.  Ms. Favetta is

14  going to address the sophisticated needs.

15          THE COURT:  All right.

16          MS. RIGBY:  And just to be quick, while I'm still up,

17  we did submit an objection regarding criminal history.  We're

18  going to rest on our papers on that issue.

19          THE COURT:  Regarding what, I'm sorry?

20          MS. RIGBY:  The criminal history score, Your Honor.

21          THE COURT:  All right.

22          MS. RIGBY:  We're going to rest on our papers on that.

23          THE COURT:  All right.

24          MS. FAVETTA:  Good morning, Your Honor.  I know the

25  Court has our papers explaining why the government has not met

1  their burden in establishing why the sophisticated means

2  enhancement should apply.

3          Does Your Honor have any questions before I

4  proceed?

5          THE COURT:  You go ahead and tell me what you want to

6  tell me.

7          MS. FAVETTA:  Mr. Rahim marketed, he advertised, and

8  in doing so made false promises to his consumers.  This is the

9  kind of conduct that is the backbone of any fraud.  Therefore,

10 Mr. Rahim's own intentional conduct was not sophisticated.

11          In November 2015, the Sentencing Commission revised

12 the guidelines regarding sophisticated means to only apply if

13 the defendant himself intentionally engaged in or caused the

14 conduct constituting sophisticated means.  The government has

15 failed to meet their burden in showing the enhancement should

16 apply because all they have pointed to are either conduct that

17 was caused or perpetrated by Mr. Rahim's co-conspirators or

18 conduct that is not sophisticated.

19          As to the first, the government relies on the

20 conduct of Mr. Rahim's co-conspirators because they struggle to

21 find any conduct of Mr. Rahim's that fits the bill.  The

22 government argues that the involvement of bots and crypto

23 currency is evidence of sophistication, but the sophisticated

24 conduct related to the bots and crypto currency was conduct

25 perpetrated by Mr. Rahim's co-conspirators, not Mr. Rahim.

1        The government admits that Mr. Rahim did not create

2   the bots or the algorithms at issue.  Mr. Rahim also did not

3   require the use of crypto, transfer investors' money in and out

4   of crypto, pool the crypto funds, or create the use of

5   intermediary foreign wallets to hold the funds, or even cause

6   the crash of the bots.  The conduct that is sophisticated with

7   respect to the bots and crypto was not caused by Mr. Rahim.

8        Mr. Rahim also did not benefit from the use of

9   crypto because Mr. Rahim's commission, his benefit was based

10   off of subscription fees, which were collected through a U.S.

11   credit card processing company.  Whether the funds were in

12   crypto, cash, or any other form did not matter, as he collected

13   these funds through an entirely different source.

14        Mr. Rahim's lack of reliance on crypto is also

15   demonstrated by the fact that for his own businesses he did not

16   require the use of crypto, unlike his co-conspirators.  He was

17   not dependent upon the use of crypto for his conduct, and he

18   was not the driver for his decisions.

19        The same reason why -- this is the same reason why

20   the government's argument regarding traceability does not

21   apply.  Mr. Rahim's subscriptions were collected through a U.S.

22   credit card processing company that the government was able to

23   subpoena and track, and therefore, the funds attributed to

24   Mr. Rahim's benefit were traceable.

25        The government also argues that because Mr. Rahim

1  was simply aware of an advertised nature of the offshore nature

2  of FX Primary, that this converts his conduct into being

3  sophisticated.  But awareness and advertising is not enough to

4  convert conduct into sophistication.  Mr. Rahim did not create

5  FX Primary.  He did not own it.  He did not claim that it was

6  regulated by an agency in the Bahamas and did not incorporate

7  FX Primary into a foreign nation.

8          Again, just like with the bots and crypto currency,

9  Mr. Rahim did not benefit from the use of FX Primary

10  specifically for its offshore nature, because his compensation

11  was derived from subscription fees.

12          The government also makes much of the fact that

13  Judge Alston found that Mr. Rahim's co-conspirator,

14  Mr. Higgins, warranted the sophisticated means enhancement, and

15  argues that his conduct pales in scope and length to

16  Mr. Rahim's conduct.  But the conduct that Judge Alston relied

17  upon was not conduct perpetrated or caused by Mr. Rahim.

18  Mr. Rahim did not steal $4 million directly from investors'

19  funds into his own personal wallet, like Mr. Higgins did.

20  Mr. Rahim did not handle or even touch investors' funds, create

21  offshore financial accounts, or deny customers' requests for

22  refunds.  The government has also not produced evidence that

23  Mr. Rahim knew that crypto funds were pooled or that Mr.

24  Higgins was going to take all the investors' funds and run

25  away.

1          Mr. Rahim's role as the marketer, advertiser, and

2    communicator of false representation shows that he was in a

3    customer facing role.  And courts have found that customer

4    facing roles not involved in the sophisticated,

5    behind-the-scenes conduct did not justify the enhancement, such

6    as the Court did in *United States v. Hess*.

7          The government hinges their argument on their

8    citation to *United States v. Adepoju* stating that the

9    enhancement applies where the entirety of the scheme

10   constitutes sophisticated means, even if every individual

11   action is not sophisticated.  But the Sentencing Commission

12   specifically clarified this holding in 2015 when they revised

13   the guidelines regarding sophisticated means.  The commission

14   stated that, that they revised the guideline to focus only on

15   defendant's intentional conduct because prior to the amendment

16   courts had applied this enhancement on the basis of the

17   sophistication of the overall scheme without a determination of

18   whether the defendant's own conduct was sophisticated.

19          Furthermore, the government's focus on the entirety

20   of the scheme is also not the complete holding by the Fourth

21   Circuit in *Adepoju*.  The Fourth Circuit explained in the

22   sentence directly after, that even so, sophistication requires

23   more than the concealment or complexities inherent in fraud.

24          Furthermore, noticeably absent from the

25   government's briefing is any case cite to after 2015 after the

1   Sentencing Commission's revision to the guideline reflecting

2   the importance of this guideline change.  The government also

3   has not addressed in their briefing the reason why the

4   Sentencing Commission changed this guideline.  The reason being

5   that it is important to focus on the defendant's own culpable

6   conduct in sentencing.

7              In sum, the government has failed to prove that

8   Mr. Rahim intentionally engaged in or caused sophisticated

9   conduct.  The facts demonstrate that he was the marketer,

10  advertiser, and communicator responsible for marketing the

11  fraudulent scheme to investors.  His conduct does not rise to

12  the level of complexity or intricacy necessary to justify the

13  sophisticated means enhancement.

14             For these reasons, we respectfully request the

15  Court decline to apply the enhancement as it does not apply to

16  Mr. Rahim's conduct.

17             Thank you, Your Honor.

18         THE COURT:  All right.

19             Do you have anything else now?  Is there another

20  objection or does that cover it?

21         MS. RIGBY:  That covers it, Your Honor.  The criminal

22  history one, again, we're resting on our papers.

23         THE COURT:  All right.  Thank you.

24         MS. STEIN:  Good morning, Your Honor.  And just for

25  the record, Ashley Stein, S-T-E-I-N.

1        Your Honor, I would like to address the objection

2   made to the application of 3C1.3.  That would be the

3   three-level enhancement for committing an offense while on

4   pretrial release.

5        Your Honor, there is no dispute that the defendant

6   has been on pretrial release since June of 2023, and also no

7   dispute that the statement of facts for the wire fraud

8   conviction contain admissions about conduct that Rahim

9   committed while on pretrial release.  Specifically, launching

10  and falsely advertising about two genius artificial

11  intelligence algorithms which were launched in June of 2023 and

12  January of 2024.

13       Your Honor, committing an offense while on pretrial

14  release does not require a separate conviction.  Rather, there

15  are two ways in which the Court can find that Rahim's

16  investment fraud conduct was an offense committed while on

17  pretrial release and that it occurred until at least February

18  2024, which was well beyond June of 2023.

19       First, it was part of the relevant offense conduct

20  to which he pleaded guilty.  In 2019, the Ninth Circuit, while

21  reviewing a matter for plain error, found out the guidelines --

22  defined offense for purposes of 3C1.3 enhancement broadly to

23  include all relevant conduct.  Meaning, among other things,

24  acts that were part of the same course of conduct or common

25  scheme or plan as the offense of conviction.

1          Specifically in that matter, Your Honor, which I

2     have copies for if you would like, the defendant similarly

3     alleged that all the counts of conviction --

4          MS. RIGBY:  Your Honor, I'm sorry to interrupt.  I

5     don't think I have this case.

6          I don't think it's cited in the brief.  Right?

7          MS. STEIN:  No.

8          MS. RIGBY:  Okay.  Thanks.

9          MS. STEIN:  My apologies, Your Honor.

10         In this matter, the defendant similarly alleged

11    that all his counts of conviction were prior to his pretrial

12    release even if some conduct was after.  The Court found that

13    the defendant continued the same course of conduct that led to

14    his offense of conviction, and hence, the district court did

15    not plainly err in applying 3C1.3.

16         Here, similarly, there is no question that Rahim's

17    conduct, which continued through at least February 2024, is

18    directly tied to the same conduct underlying his wire fraud

19    conviction, and it is all part of the investment fraud scheme.

20    In addition, Your Honor, as noted in Agent Thomas' declaration

21    that was provided by the government, it is very likely that the

22    defendant's conduct actually occurred well beyond this and

23    until early 2025.

24         Furthermore, Your Honor, the Court can find that

25    Rahim admitted to his offense conduct in the statement of facts

1 where he pleaded guilty to wire fraud. Under the Sentencing

2 Guidelines in Section 1B1.2, Subsection c, it states that, A

3 plea agreement containing a stipulation that specifically

4 establishes the commission of an additional offense shall be

5 treated as if the defendant has been convicted of additional

6 counts charging those offenses.

7        Again, here, for the plea agreement and the

8 statement of facts, Rahim has admitted to conduct that

9 establishes an investment fraud scheme which occurred through

10 at least February 2024. Whether the Court considers Rahim's

11 offense conduct related to the scheme as relevant conduct to

12 his wire fraud conviction as an additional offense established

13 in the statement of facts, or both, the result is the same.

14 The three-point enhancement for committing an offense while on

15 pretrial release is applicable and was appropriate --

16 appropriately applied by probation in the PSR.

17        Thank you.

18      MS. SHARTAR: Thank you, Your Honor. I will follow up

19 on the sophisticated means. And I did talk to my co-counsel,

20 and we will also rest on our papers as to the criminal history.

21      THE COURT: Okay.

22      MS. SHARTAR: The defense is arguing that the

23 sophisticated means should only pertain to his conduct only,

24 and it is a little more nuanced than that. Specifically, the

25 guidelines state, the offense otherwise involves sophisticated

1 means, and the defendant intentionally engaged in or caused the

2 conduct constituting sophisticated means.

3           The United States is not relying on acts that

4 others did on their own whim.  They're relying on acts in which

5 the defendant intentionally engaged in the conspiracy with his

6 co-conspirators.  But, Your Honor, you don't even have to go

7 that far.  If I first just tell you what the defendant did just

8 on his own, his acts only, we still meet the burden of

9 sophisticated means.

10           First off, his products, there were multiple of

11 them, that was just him.  In fact, at least four of the

12 products, five of the products had nothing to do with his

13 co-conspirators.

14           And, Your Honor, the -- the government submitted a

15 very long declaration.  And part of the reason was to give a

16 backstory as to what these websites look like.  And so many of

17 our exhibits were screen shots of the websites.  Those were

18 Mr. Rahim's websites.  Those weren't his co-conspirators'

19 websites.  The long fact sections with all of the conduct, the

20 screen shots.  The examp -- with the exception of one screen

21 shot for FXP Primary, every single website was one that was

22 under his control, one that he directed.

23           And those -- those websites were important.  The

24 content was prolific.  It included statistics, arguments.  It

25 included details about how you would send your money, how you

1  signed up.  Questions, facts, answers.  And that's important

2  because it goes to the execution of the scheme.  Sophisticated

3  means isn't just the concealment.  It is also the execution of

4  the scheme.

5          And it wasn't just the websites, Your Honor.  It

6  was also the use of discord where they're hundreds of posts, if

7  not thousands.  And he did take steps to conceal the scheme in

8  here.  He intentionally deleted posts of others that he did not

9  like, and he created fake profiles to make it seem like this

10 was a legit business that others supported.

11         He created hundreds of posts and videos on TikTok

12 and Instagram.  That is significant content and that also goes

13 to the sophisticated means of creating an illusion of a

14 legitimate business.

15         And on top of that, yes, credit cards are easily

16 traceable, but not when you put your credit card funds, meaning

17 he was shut down by one of the credit card processors.  And

18 what did he do?  He went and got somebody else to let him use

19 their name, their social security number to put on that

20 specific credit card processing.

21         That is concealing.  That is concealing who will

22 receive the funds.  And who received those funds was Mr. Rahim.

23         Now, if you then move on to TradeAutomation and

24 BotsforWealth, he also took specific acts himself to conceal

25 the fraud.  He brought a lawsuit after BotsforWealth sued.  He

created a fake victim impact statement touting that people should be responding to him so that he could engage lawyers and FBI.

He had no intention of going to the FBI because that would have blown the fraud wide open. So by sending out e-mails to victims with a fake victim impact statement, that is concealment of the crime.

While he may not have programmed the bots, he specifically sought the use of others. And you don't even have to go to TradeAutomation or BotsforWealth for that. He did that for at least one of his own products that he sold. It was based on an algorithm. He intentionally got a bot. That is not -- while it may be more normal today, when you link it with everything else in the scheme, it clearly makes the execution sophisticated.

He also agreed that people should be given credits. He posted about the credits. He discussed the credits on his discord. That is intentionally engaging in sophisticated means to hide that trade automation is failing. Because if you issue a credit, people are going to keep their money and he's going to earn more fees.

And specifically, he directed individuals to send money offshore. By having a website touting the benefits of using money to be sent offshore in a crypto currency, he was intentionally engaging in the conduct.

1          So, Your Honor, this was an especially complex or

2   intricate fraud pertaining both to the execution and the

3   concealment, and you don't have to look at the other facts of

4   his defendants.  You could look at his own acts, and we still

5   win.

6          And this case is much like the *Fowler* case that the

7   government cited where there was prolific -- where there was

8   literature created.  We have literature here, websites, discord

9   posts, fake clothing, marketing.  Yes, there was marketing

10  here.  While he was the face of the marketing, he was also the

11  entrepreneur behind it all.  It was his ideas.  It was him

12  reaching out to people.

13         And then that case also had an -- claiming an

14  attorney suing Coca-Cola.  Here, he also brought a lawsuit that

15  was dismissed with fake information supporting it on the

16  discord page.

17         Your Honor, you don't have to look at his

18  co-conspirators' actions to find the sophisticated means.  But

19  even when you do, it's because he directly engaged in those

20  aspects and specifically pointed his customers and his victims

21  to those items.

22         MS. FAVETTA:  Brief reply, Your Honor?

23         THE COURT:  All right.

24         MS. FAVETTA:  Your Honor, the heart of the

25  government's argument regarding sophisticated means, the

1  conduct that they've pointed to is that Mr. Rahim created

2  websites, he posted on discord and social media, and he had

3  multiple products.  That does not meet the requirement

4  necessary to show especially intricate or especially complex

5  conduct.

6         Furthermore, the government's citation to *United*

7  *States v. Fowler* is distinguishable here because there the

8  defendant in *Fowler* was the sole perpetrator, the sole

9  defendant of the conduct itself.  And there actually like

10 Mr. Rahim's co-conspirator, Mr. Higgins, the defendant took

11 100 -- 1.3 million directly from the victims.

12         Thank you, Your Honor.

13         MS. RIGBY:  Your Honor, I want to briefly reply on

14 3C1.3 as well.

15         THE COURT:  All right.

16         MS. RIGBY:  On the Ninth Circuit case, Your Honor,

17 that's a 1993 case, was not cited in the brief; I haven't

18 reviewed it.  But it's -- doesn't bind this Court.  And the

19 issue here is what the guideline says, what the text says.

20         So, the text, Your Honor, provides, If the

21 statutory -- if a statutory sentencing enhancement under 18

22 U.S.C. 3147 applies, increase the offense level by three

23 levels.  This guideline only applies if 3147 applies.

24         I acknowledge what the guidelines say about

25 relevant conduct in general, but nothing in the relevant

1    conduct section can make a statute apply.  The relevant conduct

2    provisions provide that you can consider additional conduct,

3    additional stipulations for purposes of -- for purposes --

4    well, I'm not looking at the exact text, Your Honor, and I

5    should.  But you may consider for purposes of the guidelines as

6    though he had been convicted of other counts, but that's not

7    what's at issue here.

8           This guideline says that the enhancement only

9    applies if 3147 applies.  3147 does not apply.  The government

10   has not sought an enhancement under 3147, and they could not.

11   The government wants to characterize the fraud thing -- the

12   fraud allegations as one big fraud scheme, but that's not what

13   happened here.  There were three separate schemes alleged and

14   acknowledged in the statement of facts, but there was only one

15   wire fraud acknowledged.

16          The government points to the language in the

17   relevant conduct -- in the relevant conduct sections.  It says,

18   if there is a stip -- stipulation to an additional offense,

19   then the Court can consider that for purposes of calculating

20   the guidelines as though there were multiple counts.  But he

21   did not stipulate to multiple wire frauds.  He stipulated to

22   one wire fraud, and he admitted to other fraudulent conduct as

23   relevant conduct.  That's number one.

24          And number two, nothing in those sections changes

25   what 3147 applies whether -- whether a statute applies, and

1 3147 only applies if the offense of conviction relates to

2 conduct while he was on pretrial release.  The information in

3 the case -- I interrupted myself earlier.  The information in

4 this case concerns only TradeAutomation conduct which ended in

5 March of 2023.

6 　　　　The government has not sought to apply 3147.  They

7 could not for that reason.  3147 does not apply, and therefore,

8 this guideline which specifically states that there's only a

9 three-level enhancement if the enhancement under 81 -- excuse

10 me, under 3147 applies.  It does not.  This enhancement should

11 not apply.

12 　　　　THE COURT:  All right.

13 　　　　Well, I find that these guideline factors have been

14 properly assessed at the 97 to 121 months that the probation

15 officer assesses here.  I find that the objection to the

16 calculations, they're not well taken, and I find that the

17 assessments have been applied by the probation officer -- or

18 should they have been applied are for the reasons stated in the

19 presentence report.

20 　　　　Now, do you want to talk to me about sentencing for

21 a bit?

22 　　　　MS. SHARTAR:  Yes, Your Honor.  Just one housekeeping

23 matter.

24 　　　　Co-counsel -- defense counsel and I spoke about the

25 fact that this has been two cases that's been consolidated.

1   And so we do believe that it is best to move forward with two

2   judgments, and then the time would be either concurrent or

3   consecutive up to --

4           THE COURT:  Well, I assume that my -- what I said

5   applies to both cases.  They're being sentenced together here.

6           MS. SHARTAR:  Right.

7           THE COURT:  They're being argued together.  I don't

8   know how they could be otherwise separated.

9           MS. SHARTAR:  I think that it could be...

10      (SPEAKING TO OTHER COUNSEL.)

11          THE COURT:  But anyway, it's a moot point.  I apply

12  them to both cases, so it's moot now.

13          MS. SHARTAR:  Okay.

14          THE COURT:  It will be --

15          MS. SHARTAR:  Okay.

16          THE COURT:  I don't know what we're arguing about

17  here.

18          MS. RIGBY:  Yeah, I'm not -- I'm not sure we are, Your

19  Honor.  I think -- I'm being reminded to come to the mic, Your

20  Honor.

21              No, I don't -- I don't think there's disagreement

22  of that.  There will be a finding.  It will apply in both

23  cases.  I think Ms. Shartar is --

24          THE COURT:  Well, I've already applied it, rightly or

25  wrongly.

1          MS. RIGBY:  Right.

2          THE COURT:  If there's any other thing, you're going

3     to have to talk to somebody else about it because I'm applying

4     it to both cases.

5          MS. RIGBY:  Yeah.  Now, I think -- I think, Your

6     Honor, we're -- we're in total agreement about that.  I think

7     the issue is whether there should be one judgment or two

8     judgments at the end.

9          MS. SHARTAR:  Yes.

10         MS. RIGBY:  And Ms. Shartar is suggesting that for

11    each criminal CR matter there should be a separate judgment.

12         THE COURT:  Well --

13         MS. RIGBY:  We are each --

14         THE COURT:  -- why don't you wait until I sentence and

15    then we'll talk about it.

16         MS. SHARTAR:  My apologies, Your Honor.

17         THE COURT:  Now, do you want to talk to me about

18    sentencing?

19              The defendant.  Does anybody want to speak for him?

20         MR. WEBER:  Yes, Judge, I do.

21              Good morning, Your Honor.  Richard Weber from

22    Winston & Strawn.

23              Your Honor, on behalf of Mr. Rahim, we are

24    respectfully requesting Your Honor for a downward variance and

25    to sentence Mr. Rahim to a sentence under the guideline range

1   and for a sentence of not more than 51 months.

2           Let me first say, Judge, that Mr. Rahim takes full

3   responsibility for his actions.  He has completely and totally

4   accepted responsibility for his crimes for which he has pleaded

5   guilty to.  He is on a path to change his life and is truly

6   apologetic to this Court, to the government, to the IRS, and to

7   his victims.  And he has detailed this in a letter to the Court

8   where he expresses these sentiments.

9           Mr. Rahim has a wife and four school-aged children.

10  He is a good husband and a father, and his actions have caused

11  great stress to him and his family which will take years to

12  heal.  He accepts responsibility.  He does not blame others for

13  his conduct, but it has taken a toll on his family and his

14  health.

15          Mr. Rahim is extremely remorseful.  He is sorry

16  that he lied and misled and hurt his victims in this case.  He

17  understands the seriousness of his actions and has spent every

18  day since this case started - and I've been involved in this

19  case, Judge, for over a year now - thinking about the case,

20  about the impact of the case on his loved ones and his family

21  and the victims.

22          Mr. Rahim intends to never stray from the law

23  again, and he has worked very hard to identify what in him has

24  brought him to commit these offenses for which he has accepted

25  full responsibility.  Your Honor, when you consider the -- the

1 factors in 3553, again, we believe a sentence of no more than

2 51 months is necessary in this case.

3       Mr. Rahim is someone that I would describe as a

4 prolific entrepreneur. He has begun his life really generating

5 legitimate income through various businesses, and he's been

6 successful in being able to do so. And he's always tried to

7 succeed to ensure a comfortable life for himself and his

8 family.

9       Your Honor, his optimism and confident mindset

10 really has also been his Achilles' heel. And a great example

11 of that, Judge, is his situation with his tax obligations for

12 which he has pleaded guilty to.

13       Mr. Rahim would submit on a regular basis, Judge,

14 an extension to file his tax returns. He did so because he

15 recognized that he had an obligation to pay. He wasn't trying

16 to hide from the government, although he was avoiding the

17 inevitable of having to pay the IRS, hoping that one day his

18 businesses would generate enough income to meet those

19 obligations. One year led to the next year, and it snowballed

20 from there.

21       Mr. Rahim, although recognizing the seriousness of

22 the crimes, does intend to pay back the government and the

23 victims. And he needs to be out, Judge, in order to work, to

24 work legitimately, and to pay back the IRS and the victims.

25       Mr. Rahim is not a young man. He has significant

1   health issues, which we have documented on the record, and the

2   more time he spends incarcerated, the less likely he'll be able

3   to pay the government and the victims in this case.

4           Judge, any sentence greater than 51 months would

5   produce an unwarranted disparity when compared to similar

6   cases.  And we cite various cases in our brief.  I will not go

7   through all of those, Judge, this morning, but just two quickly

8   to mention to this Court because I think they're important.

9           And one is the *U.S. versus Thiara* case,

10  T-H-I-A-R-A.  It was a case before Your Honor.  It was a doctor

11  who reported bogus deductions and orchestrated a significant

12  kickback scheme, which he received over $2.2 million.  He

13  defrauded the IRS of over $3.1 million, and there were multiple

14  offenses, multiple lies to the government, to patients, to

15  insurers.  It was a -- it was a significant scheme.  The

16  guideline range in that case, Judge, was 70 to 87 months, and

17  Your Honor sentenced the defendant to 18 months.

18          Another important case, Judge, is the *U.S. versus*

19  *Higgins* case, which is a related co-defendant which was

20  sentenced before Judge Alston.  And Judge Alston gave Mr.

21  Higgins a 36-month sentence.

22          Again, Mr. Rahim takes full responsibility for his

23  actions and his conduct, but it was Mr. Higgins, the

24  co-defendant, who had control over the bots, who stole money

25  out of the victims' accounts.  There is no evidence that Mr.

1   Rahim caused the sudden drop in value of the funds tied to the
2   bots or that he profited from it, except for the subscription
3   fees that he received which he has agreed to pay back to the
4   victims.

5       And it is detailed in Mr. Rahim's letter, his hope
6   that the results of the -- of the bots working were not enough
7   to justify the means that he used to carry out the schemes and
8   to lie to the consumers.  But sentencing Mr. Rahim to a period
9   of incarceration that is more than 51 months we don't believe
10  will meet the standards of the guidelines in 3553.  And
11  although this is a serious crime -- serious crimes, Mr. Rahim
12  takes full responsibility, and it's not a crime that requires a
13  long jail term.

14      Again, comparing Mr. Rahim's conduct to Mr. Higgins
15  is important.  In fact, at sentencing, the government, Ms.
16  Shartar, specifically compared the conduct of Mr. Higgins to
17  Mr. Rahim, and she said -- and let me just quote this one line
18  from Ms. Shartar:

19      This will serve as a means of comparison for Rick
20  Rahim's sentence.  And I think that is something that the Court
21  should think of in the back of their mind, end quote.

22      That was Ms. Shartar who said that to Judge Alston
23  because she knew that it was important to compare what
24  Mr. Higgins did to Mr. Rahim.  And again, the sentence for
25  Mr. Higgins was 36 months.

When customers started to lose money, Judge, in 2022, it was Mr. Higgins who deliberately made it hard for them to pull their funds out and withdraw over $4.2 million. That was Mr. Higgins who did that, and Mr. Rahim even had his own money in those accounts that he lost. Mr. Higgins kept details of his activities with invested funds from Mr. Rahim.

Your Honor, we submit that no more than 51 months is sufficient to promote the goals of sentencing here. We believe that there is adequate justification for Mr. Rahim's sentence to be closer to Mr. Higgins, which is 36 months, but not more than 51 months.

There is no denying, Your Honor, the seriousness of Mr. Rahim's conduct, but a sentence of 51 months or even 36 months would be a very serious sentence, particularly for someone like Mr. Rahim who is nearly 60 years old, who has never served prison time before, and has significant medical issues which have been documented.

Any incarceration, Your Honor, would be significant. He'll be removed from his wife and family, unable to earn a living. His family will not be able to be with him. It will ensure that he loses out on the last few years of -- of his children's high school years. Any incarceration, Your Honor, will have a deterrent effect on Mr. Rahim, and a general deterrent effect on others. Most white collar offenders are first-time offenders who have spent no time in jail, and any

1   sentence on Mr. Rahim will be a significant consequence.

2           Mr. Rahim, in his letter to the Court, reflects

3   that he's devastated that he has harmed victims and he has

4   disappointed his wife and his children.  He acknowledges, Your

5   Honor, that in trying to outrun his debts, lying to himself and

6   others, that he has placed himself in this position, but the

7   only way he can truly redeem himself is to be able to work

8   again in a legitimate job to pay back those victims and the

9   government and to contribute once again to society.

10          Mr. Rahim understands that any further criminal

11  conduct will put him back in jail, and he will not put himself

12  in that position or put his family through that experience

13  again.

14          Finally, Judge, the longer the incarceration for

15  Mr. Rahim, the longer he is in prison, the longer he cannot put

16  his legitimate skills to use.  And with appropriate

17  supervision, he'll be able to repay the IRS and these victims.

18          Your Honor, Mr. Rahim is a decent person.  He made

19  a huge mistake.  He let greed take over his life, but he does

20  not deserve a lengthy prison term to punish him.  The pain that

21  this has caused him, his family, his health are significant.

22          He wants to redeem himself, pay back to society, to

23  his victims.  He's remorseful.  He accepts full responsibility.

24  He's ready to be sentenced, Your Honor.

25          Thank you.

1    THE COURT:  Government have anything to say?

2    MS. SHARTAR:  Yes, Your Honor.

3    This was not a huge mistake.  This wasn't singular.

4 This was prolific fraud dating back to 2009.  This was scheming

5 and cheating.  It is a way of life for the defendant.

6    The one thing that we did not talk about in the

7 enhancements was the tax fraud, and I think that is just the

8 beginning of Mr. Rahim's fraudulent lifestyle.

9    He didn't just put off paying his taxes.  He filed

10 returns.  He filed false documents leaving off significant

11 assets, including helicopters, Lamborghinis, property.  He

12 changed his house title; put it in his wife's name.  He took

13 money out of his business; dealt all in cash.  And then he also

14 didn't pay employment taxes.  Meaning, he took the money from

15 his -- his employees' paychecks; didn't give it to the

16 employees and never remitted it to the IRS.  And on top of

17 that, he has earned over $34 million since 2012 and has not

18 filed a single tax return.

19    This is not just about the investment fraud.  This

20 is about two significant frauds just within themselves, and

21 they compound on each other.

22    I'm not going to go into details of the seriousness

23 of the offense on the investment fraud.  The government has

24 briefed it.  We've talked about it.  But one thing you should

25 know is this wasn't just about Ian Higgins.  This wasn't just

1    about his co-conspirator BotsforWealth.  It was

2    ProChartSignals, OptionsCopier, lifetime membership, SnipeAlgo,

3    QQQTrade, and BotsforWealth and TradeAutomation.

4          This isn't somebody who just made a mistake.  They

5    were a knack for business, a prolific entrepreneur, a prolific

6    fraudster.  There are not many cases, Your Honor, where you

7    have three luxury homes.  By the own -- by his own PSR, he has

8    over $3.7 million in assets, of which some of that is for three

9    homes that are valued over $6 million.  Lamborghinis, Mercedes,

10   Teslas, helicopters.

11         I want to talk to you a little bit about the

12   sentencing disparities because that is important.  Your Honor,

13   you sentenced Thiara.  You also know that there was a stat max

14   in that case of three years.  That's a very important

15   distinguishing feature.  He was only charged with 7212(a).

16   That's obstructing the IRS.  He wasn't charged with a

17   healthcare fraud.  This case is more than just about taxes.

18         I did say to Judge Alston that it would be a point

19   of comparison as a floor.  Higgins committed one fraud.  This

20   defendant committed multiple frauds over an extended period of

21   time dating back to 2009.  And it's important to note that the

22   guidelines range is conservative.  And the guidelines range

23   conservatively was 6.1 million to 6.35 million.  That did not

24   include all the money the investors lost.  In fact, we do not

25   know how much the investors lost for BotsforWealth.  And the

1   investors lost well over 6 million in TradeAutomation.

2       The defendant has never ever taken responsibility.

3   His websites for these businesses only came down last night.

4   The victims here clearly understand deterrence.  More than one

5   of them pointed to the need of deterrence in this case, both

6   general deterrence and specific deterrence.

7       And there's a reason why.  When you look at his

8   criminal history, he has been committing some sort of white

9   collar crime fraud since 1987:  Bad checks, theft, fraud

10  pretense, conspiracy to commit grand larceny.

11      This isn't somebody who just woke up one day and

12  made a mistake.  The defendant was not deterred when the

13  initial IRS revenue officer knocked on the door to talk to him

14  about his taxes, symbolically knocking on the door.  He wasn't

15  deterred when IRS executed a search of his business while he

16  was committing the investment fraud.  If law enforcement shows

17  up to your business, don't you stop your investment fraud?

18      He was not deterred when BotsforWealth failed.  He

19  was not deterred when TradeAutomation failed and people were

20  begging for their funds.  No.  He was part of the team to come

21  up with the credit so he could keep getting fees.

22      He was not deterred when people were making

23  complaint after complaint on discord.  He was not deterred when

24  the FBI executed yet another search warrant on his phone.  He

25  was not deterred when he pled guilty in the tax conduct.  He

1  still kept his investment fraud scheme going.

2         What will deter this defendant?  Incarceration.  He

3  has more than enough assets.  He doesn't need to work.  He

4  could have started giving those assets to the United States.

5  That's what Ian Higgins did.  We reached an agreement at the

6  sentencing where he sold his multimillion dollar house and gave

7  us a check to the Marshals to go to victims.  That is action.

8  Here, we have talk.

9         The government is asking for a low end of the

10 guideline sentence.  We believe it is necessary in this case to

11 serve the factors of 3553(a).  We are also going to be asking

12 for restitution.

13        We've agreed on the amounts.  We need to finalize

14 the orders, but I do want to make it clear that we are seeking

15 restitution and the government also has a forfeiture order.

16 Thank you.

17        THE COURT:  All right.  Mr. Rahim, would you come to

18 the podium.

19        MR. WEBER:  Judge, can I just make two quick comments?

20        THE COURT:  Yeah, I -- 30 seconds.

21        MR. WEBER:  30 seconds is all I'll take.

22        Judge, we don't disagree with the seriousness of

23 the -- of the conduct, but the guideline range that we're

24 recommending and asking the Court to impose is 36 months to

25 51 months.  That is a serious offense level.  And that is a --

1 would be serious incarceration for Mr. Rahim, and I don't want

2 to lose sight of that.

3       Mr. Rahim pleaded guilty to a one-count wire fraud

4 and a tax charge. The assets that the government is talking

5 about are not assets that were purchased with fraud proceeds.

6 Mr. Rahim has agreed to the restitution of forfeiture order.

7       THE COURT: I believe you've already told me this.

8       MR. WEBER: Yes, Judge. Thank you.

9       THE COURT: Thank you.

10       Mr. Rahim, would you come to the podium.

11 (DEFENDANT COMPLIES.)

12       THE DEFENDANT: Good morning, Your Honor. I apologize

13 for moving slow.

14       THE COURT: Is there anything you want to say at this

15 time?

16       THE DEFENDANT: Your Honor, this case has been going

17 on for years. I know you have all the facts and the

18 information. I'll keep it like you said to 30 seconds.

19       I did these things. I made a lot of money. I

20 never paid taxes. I've never moved, hidden, evaded. Though

21 the actions certainly were evasive and I didn't pay taxes, I

22 accept responsibility for it.

23       And I think you've -- I hope you've read the letter

24 I sent. I'm sincere in that. I deserve to be punished, no

25 question. I only hope that Your Honor will consider the

1 severity of the punishment, that I'm standing before you ready

2 to accept it.

3 And lastly, whatever I've done to my family, that's

4 on me.  But more importantly, the only way to pay the

5 government back and other victims would be to at some point be

6 able to go back to work and do that, which I pledge to do.

7 And lastly, yes, I've agreed to forfeitures, and

8 I've agreed to repay, so I'm not -- I'm not attempting to avoid

9 that responsibility at all.

10 Thank you for your consideration.

11 THE COURT:  All right.  Well, Mr. Rahim, as I have

12 said before, I find the guideline factors to be properly

13 assessed at a range of 97 to 121 months.  And I also find

14 because of your financial condition and the restitution and

15 forfeiture that may take place here, that the imposition of any

16 fine or cost is not warranted.

17 And also considering the factors under Section

18 3553, which I must, considering the nature and the size and

19 magnitude of this offense, or these offenses, and your age and

20 your prior record, I find that a sentence somewhat below the

21 guideline range would be appropriate.

22 Now, as to case 1:23-CR-173 -- is it 73?  I believe

23 I can't read my own writing here, and that was Count 18.  It

24 will be the sentence of the Court that you be committed to the

25 custody of the Attorney General to serve a term of 60 months, a

1 three-year period of supervised release, pay a special

2 assessment fine of $100.

3           As to case 1:24-CR-179, as to Count 1, that you be

4 committed to the custody of the Attorney General to serve a

5 term of 78 months, a three-year period of supervised release,

6 pay a special assessment fine of $100.

7           The sentences in these two cases will run

8 concurrently with one another.

9           As to your conditions of supervised release, you

10 will be subject to the standard and special conditions of

11 probation that has been set out in the presentence report.

12          I will allow you to voluntarily surrender yourself

13 once space is available.

14          THE DEFENDANT:  Thank you, Your Honor.

15          THE COURT:  Now, do you have --

16          MS. SHARTAR:  This is a motion to dismiss the

17 remaining counts on --

18          THE COURT:  Oh, all right.

19          MS. SHARTAR:  -- the tax case, Your Honor.

20          THE COURT:  Hand that forward, yes.

21          MS. SHARTAR:  Give you everything at once, Your Honor.

22     (HANDING DOCUMENTS UP.)

23          THE COURT:  All right.  I'll enter those when I finish

24 the docket.

25          MS. SHARTAR:  And then, Your Honor, as noted on the

1  record, we will be submitting restitution orders for the case

2  and agree as to the amounts and we'll ask that to be part of

3  the judgment.

4       THE COURT:  I'll enter those when I receive them.

5       MS. SHARTAR:  Your Honor, are you okay with us

6  submitting them to chambers or would you like a separate motion

7  for those?

8       THE COURT:  No, no, just submit them to chambers when

9  you've agreed on them.

10       MS. SHARTAR:  Thank you, Your Honor.

11       MS. RIGBY:  Your Honor, I'd just like to ask the Court

12  to order that Mr. Rahim not be required to report within the

13  usual time frame.  We would ask the Court to order that he not

14  have to report for eight months.

15       I know that the -- the Court knows we had hired an

16  expert and we were hoping for more time for the expert to look

17  at everything, but we did push him and he did provide us with a

18  letter.  I know the Court may not have seen it.  I sent it late

19  last night to chambers, and I provided it to government.

20       I would like to hand it up, Your Honor.  It does

21  contain a one paragraph set of conclusions about the state of

22  Mr. Rahim's recovery.  I can summarize for the Court --

23       THE COURT:  Well, you --

24       MS. RIGBY:  Go ahead.

25       THE COURT:  You can summarize it for me.  Bureau of

1 Prisons has ample resources to treat whatever problem he has.

2        MS. RIGBY:  I -- Your Honor, the -- what the expert --

3        THE COURT:  I gave you a continuance earlier --

4        MS. RIGBY:  That's right, Your Honor.

5        THE COURT:  -- to get this treatment done here, and

6 that's adequate now.  I --

7        MS. RIGBY:  I would just like to be heard on it, Your

8 Honor.

9        THE COURT:  There's got to be a limit.  I mean, you

10 can keep going to doctors and never go to the penitentiary and

11 serve your time.

12        MS. RIGBY:  I understand that, Your Honor.  We're not

13 asking for that.  So Mister --

14        THE COURT:  Eight months sounds like it.

15        MS. RIGBY:  We're -- I would like to summarize what

16 the -- the expert said.  Now when -- when Mr. Rahim --

17        THE COURT:  Well, you can go ahead and --

18        MS. RIGBY:  -- had his surgery --

19        THE COURT:  You go ahead and summarize it then.

20        MS. RIGBY:  Okay.

21        When Mr. Rahim had his surgery, his doctor

22 estimated that it would take several months to recover.  I

23 don't remember or I don't have in front of me at least exactly

24 what he projected the recovery period would be.  His -- he more

25 recently said eight to ten months, but it was a little

1  confusing exactly what the surgeon meant, which is part of why

2  we went to this outside expert.

3         This outside expert, who both is an expert in

4  medicine and in what BOP can do, recommends that -- or his

5  opinion is that it would take roughly six to eight months from

6  the time of sentencing, to recover from this kind of

7  sentencing.  And in particular, this would allow, he says, For

8  continuity of care, proper rehabilitation, physical therapy,

9  and occupational therapy.  And he puts in parentheses, not

10  available in prison.

11         So what he's emphasizing is that for Mr. Rahim to

12  have appropriate physical therapy and occupational therapy to

13  fully recover from his surgery he will not get that in prison,

14  so that is the basis for our request, Your Honor, that he be

15  allowed out.  And again, he says six to eight months would be

16  appropriate from January.  So six to eight months --

17         THE COURT:  I understand.

18         MS. RIGBY:  -- from January would be --

19         THE COURT:  All right.  I understand.  I understand.

20  That request is denied.

21         MS. RIGBY:  And, Your Honor, I was going to add, the

22  government is in agreement that Mr. Rahim should not have to

23  report for at least I think they were going to say two and a

24  half months, and this is in addition --

25         THE COURT:  I'll give you two and a half months,

1  whatever that date it.  What's two and a half months from now?

2         MS. RIGBY:  I've conferred with the government, and

3  they were thinking after Memorial Day.  And I will also note

4  for the record, Your Honor, that --

5         THE COURT:  That's May 30th, isn't it, or the 31st?

6  What's Memorial Day?

7         MS. SHARTAR:  Your Honor, I actually think it might be

8  a little earlier.  I think it's like May 20 -- my apologies,

9  Your Honor.  It's May 26, I think.

10        THE COURT:  26?  Well, why don't I do it May 28th.

11 Report anytime after May 28.

12        MS. RIGBY:  And, Your Honor, while the Court is

13 looking at what to put in the order, we would ask that the

14 Court recommend that he be placed at a facility that can handle

15 his medical concerns --

16        THE COURT:  I will --

17        MS. RIGBY:  -- as close as possible --

18        THE COURT:  -- recommend that.

19        MS. RIGBY:  -- to Virginia.

20        THE COURT:  I will recommend that.

21        MS. RIGBY:  Thank you, Your Honor.  I don't think we

22 have anything further.

23        MS. SHARTAR:  Your Honor, we would ask for one of his

24 supervised release terms be altered, and that's -- he kept

25 these websites up.  Until recently, one of them still had links

1 to pay with crypto currency.  My understanding that yesterday

2 he took down all of the business websites.

3       The government would ask that his business website

4 for any investment advice --

5       THE COURT:  Send me an order.  Send me an order for

6 that and I'll enter it.

7       MS. SHARTAR:  Thank you, Your Honor.

8       MS. RIGBY:  Thank you, Your Honor.

9       Oh, I'm sorry, Your Honor.  I apologize.  There was

10 one more condition.

11       THE COURT:  We're spending too much time on this case.

12       MS. RIGBY:  I apologize.

13       THE COURT:  What else do you want?

14       MS. RIGBY:  Mr. Rahim has doctors in DC and Maryland.

15 His current condition requires him to ask for permission from

16 his pretrial officer to go to --

17       THE COURT:  Well, he can go see his doctors.

18 That's -- I don't think there will be a problem about that.

19 The probation officer doesn't -- pretrial is not going to keep

20 him from going to doctors.

21       MS. RIGBY:  That's right, Your Honor, but he has to

22 ask each time.  And he's getting ready to do physical therapy

23 and occupational therapy, so if he could just not ask every

24 time, if the Court could just order that he --

25       THE COURT:  Well, take that up with the probation

1  officer.  He can tell him when he wants to go.

2          MS. RIGBY:  Understood, Your Honor.

3          MS. SHARTAR:  Thank you, Your Honor.

4          MR. WEBER:  Thank you, Your Honor.

5              (PROCEEDINGS CONCLUDED AT 11:03 A.M.)

6                      -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT    )

2   EASTERN DISTRICT OF VIRGINIA    )

3

4           I, JULIE A. GOODWIN, Official Court Reporter for

5   the United States District Court, Eastern District of Virginia,

6   do hereby certify that the foregoing is a correct transcript

7   from the record of proceedings in the above matter, to the best

8   of my ability.

9           I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14          Certified to by me this 9TH day of APRIL, 2025.

15

16

17

18          __/s/_____

            JULIE A. GOODWIN, RPR

19          Official U.S. Court Reporter

            401 Courthouse Square

20          Eighth Floor

            Alexandria, Virginia  22314

21

22

23

24

25